CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
03/09/2020
JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 3:18-cv-00115 |
| *Plaintiff*, | |
| v. | MEMORANDUM OPINION |
| NELSON CO. BOARD OF SUPERVISORS, *et al.*, | JUDGE NORMAN K. MOON |
| *Defendants*. | |

This matter is before the Court on Defendants Nelson County, Virginia and the Nelson County Board of Supervisors' motion for summary judgment, Dkt. 36, and Plaintiff Atlantic Coast Pipeline, LLC's motion for partial judgment on the pleadings, Dkt. 26, which this Court recently converted to a Rule 56 motion for partial summary judgment pursuant to Rule 12(d).[1] Dkt. 42.

In October 2017, Atlantic received federal authorization to construct an interstate natural gas pipeline through Virginia and surrounding states, including twenty-seven miles through Nelson County, Virginia. In December 2018, the Nelson County Board of Zoning Appeals, pursuant to its local environmental regulations, denied Atlantic's request to traverse 4.5 miles of floodplains within Nelson County. Atlantic now seeks a declaratory judgment in this action that it is not obligated to comply with Nelson County's regulations because, at least as applied to the Atlantic Coast Pipeline, they are preempted by federal authorization of the pipeline pursuant to the

---

[1] The Court refers to this motion at Atlantic's motion for partial summary judgment in this opinion. Dkt. 42.

Natural Gas Act.[2] Nelson County moves for summary judgment on the grounds that adjacent federal statutes show that the Natural Gas Act authorization was not intended to displace its local regulatory authority over the pipeline. Dkt. 37. For the reasons stated herein, Plaintiff's motion will be granted, and Defendant's will be denied.

## I.    UNDISPUTED FACTS & PROCEDURAL HISTORY

The Atlantic Coast Pipeline, once complete, will span 604.5 miles across West Virginia, Virginia, and North Carolina, intended as a means of transporting natural gas to eastern seaboard states. Dkt. 1, ¶ 8; Dkt. 27 at 2. Twenty-seven miles of that route will traverse Nelson County, Virginia. Dkt. 1, ¶ 8; Dkt. 27 at 2. Because this case turns on overlapping federal, state, and local laws, the Court will first provide an overview of the relevant legal landscape and its interaction with the Atlantic Coast Pipeline.

FERC Certification

As an interstate natural gas company under the jurisdiction of the Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq.*, Atlantic Coast Pipeline ("Atlantic" or "ACP") had to obtain authorization to construct and operate the project from the Federal Energy Regulatory Commission ("FERC"), the agency tasked with implementing the NGA. 15 U.S.C. § 717, *et seq.* This authorization comes in the form of a Certificate of Public Convenience and Necessity ("CPCN"). *Id.*, § 717f(e). Before issuing a CPCN, FERC must find that the project "is or will be required by the present or future public convenience and necessity." *Id.* Atlantic submitted its application for a CPCN in September 2015. Dkt. 1-1.

In its review of Atlantic's CPCN application, FERC conducted an environmental review

---

[2] Atlantic also seeks injunctions preventing Nelson County from enforcing its floodplain regulations or any similar zoning ordinance, although Atlantic's present motion for partial summary judgment concerns only its claim for declaratory relief. Dkt. 26.

of the proposed project, analyzing "the need for the proposal, … alternatives [to said proposal], … [and] the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b). Prior to the Environmental Impact Statement's ("EIS") preparation, FERC staff and other parties to the EIS[3] conducted seventeen open-house meetings and ten public scoping meetings,[4] where more than 1,500 people attended and were invited to assist in identifying "environmental issues that should be addressed in the EIS." *Id.* at 1-13, 1-14. This was supplemented by additional visits by agency staff to "certain areas that could be affected by ACP" as well as an "inspect[ion] of the remainder of [the] ACP … area via automobile and helicopter in conjunction with open houses, public scoping meetings, and other meetings." *Id.* at 1-14. FERC then analyzed potential impacts the pipeline might have on the environment, stating:

> Construction and operation of the projects could result in numerous impacts on the environment. We evaluated the impacts of the projects, taking into consideration Atlantic's … proposed impact avoidance, minimization, and mitigation measures on geology, soils, groundwater, surface water, wetlands, vegetation, wildlife, fisheries, special status species, land use, recreation, visual resources, socioeconomics, cultural resources, air quality, noise, and safety and reliability.

EIS at ES-3 (Executive Summary). This environmental review resulted in an 866-page EIS, produced pursuant to regulations promulgated under the National Environmental Policy Act. 40 C.F.R. §§ 1500–08; 18 C.F.R. § 380; 42 U.S.C. § 4332(2)(C). The EIS "describe[d] the affected environment as it currently exists, addresse[d] the environmental consequences of ACP and SHP, and compare[d] the projects' potential impacts to those of various alternatives." EIS at 1.2

---

[3] These other parties to the EIS were Atlantic, Merjent, Inc (FERC's third-party environmental contractor), and Dominion Energy Transmission, Inc. ("DETI"), which sought authorization to construct and operate the Supply Header Project ("SHP"), a "separate, but related, interstate natural gas transmission pipeline[.]" EIS at 1-1. Although SHP and ACP were analyzed in a single EIS, they sought separate CPCNs. *Id.*

[4] One such meeting took place in Lovingston, Virginia, the seat of Nelson County. EIS at 1-14.

("Purpose and Scope of This EIS"). One of the EIS's four principal purposes was to "identify and assess potential impacts on the natural and human environment that would result from constructing and operating ACP." *Id.*

The EIS devoted considerable analysis to potential environmental impact on floodplains in the pipeline's path. This floodplain analysis was part of a larger sixty-six page review of all potential environmental impacts on water bodies, listing the 1,536 waterbody crossings within ACP's "workspace" studied over the course of several years through field surveys, aerial photography, and GIS-based information databases. EIS at 4-100. Within this analysis of water resources, FERC studied 5.2 miles identified by FEMA as minimal flood hazard areas and 41.3 miles of ACP's route identified by FEMA as "Special Flood Hazard Areas," including 3.5 miles designated as a Special Flood Hazard Area in ACP's route through Nelson County. EIS at 4-105. With respect to floodplains in particular, the EIS concluded: "Based on Atlantic's … construction and restoration measures, and the minor project-related modifications within floodplains, we conclude that constructing and operating ACP … would not result in a significant impact on floodplains or result in a measurable increase on future flood events." EIS at 4-118. FERC also analyzed potential impacts on floodplains in its discussion of potential geological impacts, further concluding that "[c]onstruction of ACP … through 100-year floodplains would not result in the loss of floodplain storage as the pipelines are installed below the ground surface and would not displace flood waters." EIS at 4-31. And that "[c]onstruction of the aboveground facilities could result in a reduction of flood storage capacity within the floodplain, but we conclude it is minor based on the overall storage capacity of the affected floodplains." *Id.*

The EIS at several points also clearly contemplated some degree of compliance with local regulation by Atlantic. For example, although the EIS states that "[b]ased on the avoidance and

minimization measures developed by Atlantic … and our recommendations, we conclude that surface water and wetland impacts would be effectively minimized or mitigated," it continues on to state that "[c]onstruction and operation-related impacts on wetlands would be further minimized or mitigated by compliance with the conditions imposed by the USACE and state water regulatory agencies." EIS at ES-10. With respect to floodplains in particular, the EIS states that "Atlantic … [has] committed to obtaining floodplain permits, where applicable, for the projects (typically through county-level agencies). These permits would verify that placement of these structures within a floodplain would not pose a risk of damage to the structures, and would not result in a stage increase in flood elevations of surrounding properties." EIS at 4-118.

However, both the EIS and resulting CPCN also included the following language:

> FERC encourages cooperation between applicants and state and local authorities; however, state and local agencies, through the application of state and local laws, may not prohibit or unreasonably delay the construction or operation of facilities approved by FERC. Any state or local permits issued with respect to jurisdictional facilities must be consistent with the conditions of any authorization issued by FERC.

EIS at 1-24 (citing *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988); *Transmission, Inc. v. Summers*, 723 F.3d 238, 245 (D.C. Cir. 2013)); Dkt. 1-1, ¶ 324. In October 2017, relying on its EIS, FERC issued Atlantic its CPCN, making various findings as to the pipeline's economic, environmental, and human impacts. *Id.* In granting this CPCN, FERC concluded that the pipeline "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e).

Army Corps of Engineers Authorization

In addition to authorization from FERC, Atlantic was also required to receive authorization from the U.S. Army Corps of Engineers ("USACE") to construct the pipeline, as the project would involve the "discharge of dredged or fill material" into the "waters of the United States" and thus

fall under USACE's jurisdiction under section 404 of the Clean Water Act ("CWA"). 33 U.S.C. § 1344; *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 123 (1985); *see also Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 750 (4th Cir. 2019) (describing Atlantic's permitting process with FERC and USACE). To this end, USACE has issued several "Nationwide Permits" broadly authorizing entities conducting certain activities provided they meet several General Conditions imposed by USACE, as well as Specific Conditions it may impose on a case-by-case basis. *See* Issuance and Reissuance of Nationwide Permits, 82 Fed. Reg. 1,860 (Jan. 6, 2017).

Nationwide Permit 12 ("NWP 12")—through which Atlantic received its section 404 authorization from USACE—covers "activities required for the construction, maintenance, repair, and removal of utilities lines and associated facilities in waters of the United States," 33 U.S.C. § 1344(e)(1), including "excavation, backfill or bedding for … any pipe or pipeline for the transportation of any gaseous, liquid, liquefiable, or slurry substance, for any purpose." 61 Fed. Reg. 65,914. In 2017, USACE reissued its 50 nationwide permits, including NWP 12. *See* 82 Fed. Reg. 1,860. General Condition 10, one of the conditions under NWP 12, provides that "[t]he activity must comply with any applicable FEMA-approved state or local floodplain management requirements." 71 Fed. Reg. 56,294.

Nelson County's Floodplain Regulations

On September 12, pursuant to its authority under Va. Code § 15.2-2280, the Nelson County Board of Supervisors amended its zoning ordinances to prohibit "critical facilities"—including structures that "produce, use, store, or transport" the "hazardous materials or fuel storage, and other similar improvements and uses"—from being located in any area classified by FEMA as a "Special Flood Hazard Area." Dkt. 1, ¶ 16–21; Dkt. 25, ¶ 11; Nelson County Zoning Ordinance

(hereinafter "NCZO") arts. 10-7, 10-14(L). Approximately 3.5 miles of the pipeline and one mile of access roads will cross areas designated as Special Flood Hazard Areas. Dkt. 1, ¶ 20; Dkt. 37 at 4.

Under the amended zoning ordinance pertaining to Nelson County's floodplains (the "Floodplain Regulations"), one may petition for a variance to construct a critical facility in a Special Flood Hazard Area. NCZO art. 10-7. Variances are reviewed and approved by Nelson County's Board of Zoning Appeals ("BZA"). NCZO at 74. In considering whether a variance should be granted for a critical facility, the BZA must find that the project will not cause "unacceptable or prohibited increases in flood heights," "additional threats to public safety," "extraordinary public expense," "nuisances being created," "fraud or victimization of the public," or any "conflict with local laws or ordinances." NCZO at 91.[5] Failure to comply with the Floodplains Regulations is a misdemeanor offense. NCZO arts. 10-7 10-14(L); 15-2; 10.6(A).

Nelson County's Floodplain Regulations qualify the county to participate in the National Flood Insurance Program ("NFIA"). *See* 42 U.S.C. § 4012(c)(2) (providing that areas must adopt "adequate land use and control measures" to be entitled to receive national flood insurance); 44 C.F.R. § 60.1–.26 (setting forth the criteria to "determine the adequacy of a community's flood plain management regulations"). In fact, the Floodplain Regulations are largely based on model floodplain regulations published by FEMA. *See* Dkt. 41 at 4–5; *see infra* at 20–21. However, Nelson County altered these model floodplain regulations—alterations that while discrete, were key to classifying the Atlantic Coast Pipeline as a "critical facility" requiring a discretionary variance. Namely, where the model answer targeted only facilities that "produce, use, or store"

---

[5] The Floodplain Regulations also list an additional thirteen floodplain-specific factors the BZA must consider when presented with an application for a variance. NCZO at 91.

hazardous materials, Nelson County included facilities that "produce, use, store, *or transport*" hazardous materials. Dkt. 41 at 5; *See* Dkt. 40-1, Nelson County Board of Supervisors Sept. 12, 2017 Minutes at 39 (county staff presenting measure acknowledging that "provisions were from the model Ordinance except that in section 10-15 F-1, the word transport was added …"). Such additions do not affect Nelson County's ability to participate in the National Flood Insurance Act ("NFIA") because "[a]ny community may exceed the minimum criteria … by adopting more comprehensive flood plain management regulations" and remain eligible. 44 C.F.R. § 60.1.

In October 2017, Atlantic filed a "Floodplain Development Package" to support its request for zoning permits to cross Special Flood Hazard Areas at eleven points. Dkt. 25, ¶ 12. On January 24, 2018, Nelson County advised Atlantic that the pipeline qualified as a "critical facility" pursuant to Article 10-15(F) of its zoning ordinance, and Atlantic would thus be required to secure variances from the BZA for all floodplain crossings. Dkt. 1, ¶ 27; Dkt. 25, ¶ 13. On February 5, 2018, the BZA voted unanimously to dismiss seven of Atlantic's eleven variance requests where Atlantic did not have either a recorded easement or an agreement with the underlying property owner to request a floodplain permit for the property. Dkt. 1, ¶ 29. The BZA deferred action on the remaining four variances. *Id*. On December 3, 2018, the BZA voted to deny the remaining four variance requests. *Id*., ¶ 37. Atlantic has not resubmitted the seven remaining variance requests. *Id*., ¶ 38. Atlantic initiated the present action three days later on December 6, 2018. Dkt. 1.

Procedural History

In Count One of the complaint, Atlantic seeks a declaratory judgment that it "is not required to comply with the [Floodplain Regulations], including obtaining any zoning permits for any of the floodplain crossings, as part of the construction and siting of the [pipeline]," *Id*., ¶ 47, because it "is subject to the exclusive jurisdiction of FERC." *Id*., ¶ 43. In Count Two, Atlantic seeks a

preliminary and permanent injunction preventing Nelson County from "administering or enforcing the [Floodplain Regulations] and any other local laws, regulations, or rules purporting to govern the siting, construction, and/or operation" of the pipeline. *Id.*, ¶ 54(B).

On January 1, 2019, Nelson County filed motions to dismiss Atlantic's complaint for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Dkts. 7, 9. On June 21, 2019, the Court denied both motions. Dkt. 24. Atlantic then filed its motion for partial judgment on the pleadings. Dkt. 26. The motion was fully briefed, but subsequent to the Court's decision on this motion, Nelson County filed a motion for summary judgment in which it asserted that there is no genuine dispute of fact that Atlantic is not entitled to the declaratory relief it seeks. Dkt. 36. After briefing completed on this motion, the Court gave notice pursuant to Fed. R. Civ. P. 12(d), and without objection from the parties, that the Court would treat the two outstanding motions as cross-motions for summary judgment. Dkt. 42. These motions are now ripe for disposition.

## II.    LEGAL STANDARDS

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the Court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

When presented with cross-motions for summary judgment, courts must address "each motion separately on its own merits to determine whether either of the parties deserves judgment

as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation omitted). At bottom, the question for courts in evaluating a Rule 56 motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## III.   ANALYSIS

In this Court's memorandum opinion denying Nelson County's motion to dismiss, it decided two issues relevant to the present motions. *Atlantic Coast Pipeline v. Nelson Co. Bd. of Supervisors*, No. 3:18-cv-00115, 2019 WL 2570530, at *6 (W.D. Va. June 21, 2019); Dkt. 23. First, the Court held that Nelson County's Floodplain Regulations—or more precisely, Va. Code § 15.2-2280, the Virginia statute authorizing Nelson County to enact such ordinances—did not carry the force of federal law. *Id.*[6] Second, the Court deemed declaratory relief appropriate in resolving the issue of whether the NGA—through the CPCN issued to Atlantic by FERC—preempts the Floodplain Regulations. *Id* at 7. However, the Court did not decide whether the NGA, through Atlantic's CPCN, did in fact preempt Nelson County's Floodplain Regulations as applied to the pipeline. That is the issue now before this Court.

Atlantic first contends that it is entitled to prevail on its partial motion for summary judgment because Congress occupies the field of interstate natural gas transportation, leaving states and localities such as Nelson County no ability to regulate alongside FERC. Alternatively, Atlantic argues that Nelson County's Floodplain Regulations are an obstacle to the accomplishment of the NGA's purposes and objectives. On the other hand, Nelson County

---

[6] "Nelson County's argument that the [Natural Gas Act] could not preempt the Floodplain Regulations because 'the laws of preemption do not apply to determine the hierarchy of two federal statutes' is without merit." *Id*. at 7 (citing Defendants' brief, Dkt. 10 at 13).

contends that it is entitled to summary judgment because its Floodplain Regulations cannot be preempted by Atlantic's CPCN, due to the fact that FERC, through USACE, expressly requires Atlantic to comply with "FEMA-approved state and local laws." As the following analysis demonstrates, the NGA, through Atlantic's CPCN, preempts Nelson County's Floodplain Regulations as applied to the Atlantic Coast Pipeline as a matter of obstacle preemption. Because the critical language in Nelson County's Floodplain Regulations were not "FEMA approved," USACE's Nationwide Permit conditions do not alter this conclusion.

    1.  Preemption

Under the Supremacy Clause of the United States Constitution, federal law is the "supreme Law of the Land." U.S. Const. art. IV, cl. 2. Any state or local law conflicting with federal law is preempted and thus "without effect." *Washington Gas Light Co. v. Prince George's County Council*, 711 F.3d 412, 419 (4th Cir. 2013) (citations omitted). There are two types of preemption: express and implied. *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Express preemption occurs when Congress defines "explicitly the extent to which its enactments pre-empt state law." *Id.* Implied preemption can occur in two ways: (1) when state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively" ("field preemption"); or (2) when the state law "actually conflicts with federal law" ("conflict preemption"). *Id.*

There is additional granulation within the subcategory of conflict preemption. First, conflict preemption occurs when "it is 'impossible for a private party to comply with both state and federal requirements.'" *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 480 (2013) (quoting *English*, 496 U.S. at 79). This is known as "impossibility preemption." *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 143 (1963). But impossibility is not strictly required. "[S]tate laws are preempted when they conflict with federal law … [both] where

compliance with … federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012). "Under ordinary conflict preemption principles a state law that 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of a federal law is preempted." *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). "This occurs where state law 'interferes with the methods by which the federal statute was designed to reach [its] goal.'" *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 830 (4th Cir. 2010) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992)). The Fourth Circuit has articulated that:

> [A] decision about [obstacle preemption] requires the court independently to consider national interests and their putative conflict with state interests … [P]reemption under [an obstacle preemption] theory is more an exercise of policy choices by a court than strict statutory construction.

*Abbot v. Am. Cyanamid Co.*, 844 F.2d 1108, 1113 (4th Cir. 1988). Typically, the Court's "preemption inquiry must start with the basic assumption that Congress did not intend to displace state law." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192 (4th Cir. 2007) (internal citations omitted), but this presumption "is not triggered when a State regulates in an area where there has been a history of significant federal presence" such as the interstate transportation of natural gas. *Nat'l City Bank of Ind. v. Turnbaugh*, 463 F.3d 325, 330 (4th Cir. 2006) (quoting *United States v. Locke*, 529 U.S. 89, 108 (2000); *Sierra Club v. State Water Control Board*, 898 F.3d 383, 388 (4th Cir. 2018) ("The NGA largely preempts environmental regulation of interstate natural gas pipelines by states.")

   a.   Conflict preemption

Atlantic argues that "[t]he Floodplain Regulations conflict with FERC's authority and the

CPCN because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Dkt 27. at 6 (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000); *Columbia Venture*, 604 F.3d at 830). Atlantic contends that FERC and Nelson County considered the same issue—the pipeline's potential impact on Nelson County's floodplains—and reached different conclusions. *Id.* at 8. As a result, it argues, "[t]his conflict between the [CPCN] and the Floodplain Regulations represents a policy difference," with the latter standing as an obstacle to the policy goals of the former. *Id.*

Nelson County's strongest argument in response is that to the extent both FERC and Nelson County considered the same issue and reached different conclusions, FERC and USACE specifically required Atlantic to abide by Nelson County's Floodplain Regulations, thus there can be no finding of preemption. Dkt. 37 at 6. However, as discussed later in this opinion, while USACE may require Atlantic to comply with *some* state and local laws, it does not require Atlantic to comply with Nelson County's Floodplain Regulations. Moreover, Nelson County overstates FERC's provisions regarding any duty by Atlantic to comply with state and local laws. FERC does indeed state that it expects or even requires strict compliance with other federal authorizations required to construct the pipeline, *see* 15 U.S.C. § 717n(a), but it explicitly disclaims that local agencies may prohibit construction of the pipeline through application of local laws, stating:

> FERC encourages cooperation between applicants and state and local authorities; however, state and local agencies, through the application of state and local laws, may not prohibit or unreasonably delay the construction or operation of facilities approved by FERC. Any state or local permits issued with respect to jurisdictional facilities must be consistent with the conditions of any authorization issued by FERC.

EIS at 1-24; Dkt. 1-1, ¶ 324. Contrary to Nelson County's reading of FERC's guidance, Atlantic's CPCN rejects the prospect that conflicting state or local laws may be used to block construction of a FERC-approved pipeline authorized by a CPCN. *Id.*

The EIS does provide that "Atlantic [has] committed to obtaining floodplain permits, where applicable, for the projects (typically through county-level agencies)." EIS at 4-118. The EIS continues on to state that "[t]hese permits would verify that placement of these structures within a floodplain would not pose a risk of damage to the structures, and would not result in a stage increase in flood elevations of surrounding properties." EIS at 4-118. But whatever degree of local and state cooperation may have been encouraged, nowhere did FERC expressly (or impliedly) condition its permitting on Atlantic cooperating with local authorities. In fact, it explicitly rejected such a proposition both in the EIS and in the CPCN. EIS at 1-24; Dkt. 1-1, ¶ 324; *see also Algonquin Gas Transmission, LLC v. Weymouth, Massachusetts*, 919 F.3d 54, 65 (1st Cir. 2019) ("[T]his provision does not require such cooperation from Algonquin; it merely 'encourages' it, perhaps to the satisfaction of FERC."). FERC stated that this cooperation would merely "verify" what it concluded independently: that Atlantic's construction in floodplains such as those in Nelson County "would not pose a risk of damage to the structures, and would not result in a stage increase in flood elevations of surrounding properties." EIS at 4-118; *see Nat. Gas Co. v. Iowa Utilities Bd.*, 377 F.3d 817, 822 (8th Cir. 2004) (rejecting similar argument that CPCN contemplated state and local regulation).

And to this end, there can be little doubt that FERC and Nelson County, in evaluating the pipeline's potential impact on floodplains, "reach[ed] the opposite conclusion based on essentially the same environmental considerations." *Algonquin Gas Transmission*, 919 F.3d at 65. Atlantic received from FERC its CPCN, which found that "public convenience and necessity" "require" that the pipeline be built. 15 U.S.C. § 717f(e). Nelson County's Floodplain Regulations address essentially the same potential floodplain impacts as FERC in its CPCN and EIS. *See supra* at 6–7. Nelson County found that Atlantic had "failed or refused to provide" plans demonstrating that it

14

had adequate erosion plans for certain stream crossings. Dkt. 37 at 4. FERC found in its EIS that "[c]onstruction of ACP … through 100-year floodplains would not result in the loss of floodplain storage as the pipelines are installed below the ground surface and would not displace flood waters." EIS at 4-31. In fact, Friends of Nelson County, a group opposed to the pipeline's construction, submitted a comment during a rehearing process, arguing that FERC "failed to consider site-specific details associated with floodplain crossing impacts." Dkt. 1-1 ¶ 232. FERC responded:

> We disagree. As discussed, the facilities would be built on graveled lots that allow for some infiltration of rainwater. Based on Atlantic's and DETI's construction and restoration measures, and the minor project-related modifications within floodplains, the Final [Environmental Impact Statement] concluded, and we affirm, that constructing and operating the ACP and Supply Header Projects would not result in a significant impact on floodplains or result in a measurable increase on future flood events.

*Id.* More generally, FERC in both its EIS and CPCN analyzed the pipeline's potential impacts on surface waters and fisheries, Dkt. 1-1 (CPCN), ¶¶ 216–24, wetlands, *Id.* (CPCN), ¶¶ 225–28, heavy rainfall, *Id.* (CPCN) ¶ 221, aquifers, EIS at 4-78, watersheds, EIS at 4-100, "sensitive waters," EIS at 4-118, and any other water bodies, *Id.* (CPCN), part (2)(c) ("Water Resources"), finding that the project would have minimal impacts on such wetlands and waterbodies, and that any more serious impacts would be sufficiently mitigated. In FERC's EIS, it concluded that "[b]ased on Atlantic's . . . construction and restoration measures, and the minor project-related modifications within floodplains, we conclude that constructing and operating ACP . . . would not result in a significant impact on floodplains or result in a measurable increase on future flood events." EIR at 4-118.

Furthermore, the notion that any one locality in the path of a FERC-approved project can halt it entirely by second-guessing FERC's environmental findings clearly conflicts with both the

plain text appearing in the CPCN, ("state and local agencies, through application of state or local laws, [may not] prohibit or unreasonably delay the construction or operation of facilities approved by [FERC]"), and with the "fundamental purpose" of the NGA: "to assure an adequate and reliable supply of gas at reasonable prices." *California v. Southland Royalty Co.*, 436 U.S. 519, 523 (1978). While localities surely have an interest in regulating environmental and land-use concerns within their jurisdiction, FERC's environmental review provides a legitimate avenue for localities and other interested parties to raise such concerns and have them addressed by FERC, as was done in this case. *See* Dkt. 1-1, ¶ 223; *supra* at 3. By circumventing this process, Nelson County sought to "interfere[] with the methods by which the federal statute was designed to reach [its] goal." *Gade*, 505 U.S. at 103.

The First Circuit recently decided a similar case in *Algonquin Gas Transmission*, 919 F.3d at 57, where Algonquin sought to build a natural gas compressor station in Weymouth, Massachusetts, as part of its operation in the northeastern United States. As the compressor station fell under the NGA's jurisdiction, *see* 15 U.S.C. § 717f, Algonquin first received a CPCN from FERC, which concluded that the proposal would have no significant environmental impacts. *Id*. However, the CPCN was expressly conditioned upon Algonquin obtaining a "determination of consistency" with the Coastal Zone Management Act from the Massachusetts Office of Coastal Zone Management. *Id*. at 59. The Massachusetts Office of Coastal Management in turn required Algonquin to obtain necessary permits from the Weymouth Conservation Commission before it would grant Algonquin the determination of consistency required by FERC. *Id*. The Weymouth commission denied Algonquin's permit applications, finding that it had not sufficiently addressed certain environmental concerns related to wetlands located in Weymouth. *Id*. Algonquin then filed suit in federal court against the Town of Weymouth and the Weymouth commission seeking a

declaratory judgment that Weymouth's environmental ordinance, at least as applied to Algonquin's compressor station, is preempted by federal law and that Algonquin is not bound by Weymouth's permitting process as a result. *Id*.

While the First Circuit declined to hold that the NGA preempted the field as it relates to Weymouth's environmental ordinance, it found that the ordinance was indeed preempted as a matter of conflict preemption. *Id*. at 63–64. The court held that the NGA, through FERC's regulations, "provide[s] for a comprehensive regulatory scheme pursuant to which FERC must consider environmental, siting, and safety factors" before issuing a CPCN *Id*. at 64 (citing 18 C.F.R. § 380.5(b)(1); 40 C.F.R. § 1508.9). "Pursuant to this process, FERC—in both its environmental assessment and its CPCN—considered essentially the same environmental and safety concerns that the [Weymouth] Conservation Commission relied upon in denying Algonquin a [permit]." *Id*. Further, Weymouth "reach[ed] the opposite conclusion based on essentially the same environmental considerations." *Id*. at 65. "In doing so, the Conservation Commission's permit denial certainly poses a significant obstacle, indeed an effectively complete obstacle, to FERC's ultimate determination that 'public convenience and necessity' 'require' that the Weymouth Compressor Station be built." *Id*. (citing 15 U.S.C. § 717f(e)).

The First Circuit held this despite the fact that Algonquin's CPCN was expressly conditioned on receiving a determination of consistency from the Massachusetts Office of Coastal Zone Management, *Algonquin Gas Transmission*, 919 F.3d at 59, which received authority in part from the Costal Zone Management Act, one of three statutes protected by the NGA's savings clause. 15 U.S.C. § 717b(d)[7]; *see also Dominion Transmission, Inc. v. Summers*, 723 F.3d 238,

---

[7] "Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under--
      (1) the Coastal Zone Management Act of 1972;

240 (D.C. Cir. 2013) (finding a CPCN was not preempted by the Clean Air Act, one of the three statutes listed in the NGA's savings clause). Here, there is an even stronger case for preemption in this respect, as Atlantic's CPCN included no such express condition that Atlantic receive permitting from Nelson County regarding its floodplain impacts. Moreover, even if Nelson County was correct that its Floodplain Regulations were somehow empowered by the National Flood Insurance Act, that act is not one of the three included in the NGA's savings clause. *See* 15 U.S.C. § 717b(d).

In fact, in cases where the NGA's savings clause was not triggered, courts have gone further than *Algonquin* to hold that such state and local environmental regulation is preempted as a matter of both conflict *and* field preemption. For example, the court in *Mountain Valley Pipeline, LLC v. Wender* held that a local land-use regulation was preempted as a matter of both obstacle and field preemption where the local authority considered "factors significantly overlapping with those considered by FERC." 337 F. Supp. 3d 656, 671 (S.D.W. Va. 2018). The Eighth Circuit held similarly in finding an Iowa soil-preservation regulation preempted by the NGA, stating that Congress through FERC occupied the field in "oversee[ing] the construction and maintenance of natural gas pipelines through the issuance of certificates of public convenience and necessity." *N. Nat. Gas Co.*, 377 F.3d at 822. The Second Circuit likewise struck down a New York state environmental regulation as a matter of both field and conflict preemption, stating that "[t]he matters sought to be regulated by [New York] were … directly considered by the FERC." *Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n of State of N.Y.*, 894 F.2d 571, 579 (2d Cir. 1990).

---

(2) the Clean Air Act; or
(3) the Federal Water Pollution Control Act."

15 U.S.C. § 717b(d) ("Construction with other laws").

To be sure, neither the Fourth Circuit nor the Supreme Court have held that a certificate of public convenience and necessity preempts conflicting local ordinances either as a matter of field or obstacle preemption. However, the Supreme Court did strike down a Michigan securities statute purporting to regulate an interstate natural gas pipeline, holding unanimously that Congress had occupied the field as to the "regulation of the rates and facilities of natural gas companies used in transportation and sale for resale of natural gas in interstate commerce." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 108 (1988). And some courts have found this holding sufficiently broad to entirely displace state and local land-use authority over an interstate pipeline authorized by a CPCN. *E.g.*, *Nat'l Fuel Gas Supply Corp.*, 894 F.2d at 579. However, the Court need not go so far here as to hold that Congress has preempted *all* state and local environmental regulation affecting pipelines.

At bottom, both Nelson County's local ordinance and Congress's Natural Gas Act—through the CPCN issued by FERC—address the impact (or lack thereof) of the Atlantic Coast Pipeline on floodplains and flooding in Nelson County. After considering these factors, FERC concluded that public necessity "require[s]" the pipeline be constructed. The Nelson County BZA "reache[d] the opposite conclusion based on essentially the same environmental considerations." *Algonquin Gas Transmission*, LLC, 919 F.3d at 65; *Nat'l Fuel Gas Supply Corp.*, 894 F.2d at 579. In this manner, BZA's denial of Atlantic's variance application "poses a significant obstacle, indeed an effectively complete obstacle" to FERC's determination that public convenience and necessity require that the pipeline be constructed. *Algonquin Gas Transmission*, LLC, 919 F.3d at 65 (citing *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015)).

Finally, Nelson County argues that no conflict exists because the NGA's stated findings and declaration of purpose, 15 U.S.C. § 717, do not on their face conflict with those of the National

Flood Insurance Act, through which Nelson County was required to pass its Floodplain Regulations if it wanted to join the federal government's national flood insurance program.[8] Dkt. 31 at 6–8. As a result, Nelson County concludes, "there is no conflict in the full purposes and objectives of Congress" between the NGA and the NFIA. Dkt. 31 at 8. But that is not the conflict at issue here. As the Court's prior opinion made clear, because Nelson County's Floodplain Regulations are not an embodiment of federal law through the NFIA, the conflict is not between two federal statutes, but between the NGA and Nelson County's Floodplain Regulations. *Atlantic Coast Pipeline,* 2019 WL 2570530, at *6. And between those two, the latter stands as an obstacle to the former and, at least as applied to the Atlantic Coast Pipeline, is preempted.

### 2. Impact of Army Corps of Engineers' permitting scheme

The Court's conclusion that Nelson County's Floodplain Regulations are preempted as applied is not changed by the arguments raised by Nelson County in its motion for summary judgment regarding the impact of USACE's permitting scheme. While the USACE's permitting framework does provide for some local regulation of interstate natural gas pipelines, this is only for "FEMA-approved" local regulations. Because the key phrase in Nelson County's Floodplain Regulations was not "FEMA-approved," the USACE regulatory framework does not save it from being an obstacle to the meaning and purposes of the NGA.

In order to receive federal flood insurance established by the National Flood Insurance Act ("NFIA"), local governments must enact floodplain ordinances meeting certain requirements set by FEMA. *See* 42 U.S.C. § 4012(c)(2); 44 C.F.R. §§ 60.1–.26. To assist localities in this effort, FEMA has published model ordinances and regulations to provide localities with guidance on how

---

[8] Nelson county also attempts to revive the arguments made previously that its Floodplain Regulations carry the force of federal law, Dkt. 31 at 4–6, which the Court will not revisit here.

to tackle various environmental issues while remaining compliant with its requirements pursuant to the NFIA. *See* Managing Floodplain Development Through the NFIP, available at fema.gov/media-library/assets/documents/6029. Nelson County based its Floodplain Regulations off one such model ordinance, *see* Dkt. 42 at 6–7, but it made a critical change to the model provision. As discussed above, the Floodplain Regulations (and the model provisions) define several land uses that constitute "critical facilities," which are presumptively banned unless Nelson County's Board of Zoning Appeals grants a discretionary variance. Dkt. 42 at 6–7. FEMA's model ordinance defines one category of critical facilities in this manner:

> Structures or facilities that produce, use or store highly volatile, flammable, explosive, toxic and/or water-reactive materials.

Additional Regulatory Measures at 6-18; Dkt. 42 at 6. Nelson County's Floodplain Regulations are nearly identical, but make a key alteration, in defining the category as:

> Structures or facilities that produce, use, store, *or transport* highly volatile, flammable, explosive, toxic, and/or water-reactive materials.

Dkt. 42 at 6 (emphasis added). Pursuant to this provision, Nelson County stated that ACP qualified as a critical facility under its Floodplain Regulations, and its Board of Zoning Appeals denied all of its requested variances where it would cross Nelson County's floodplains. Dkt. 37 at 4.

Nelson County argues, however, that Atlantic must comply with this local regulation in order to be federally authorized to construct the pipeline. Its argument proceeds as follows: In addition to receiving its CPCN from FERC, Atlantic was also required to receive authorization from USACE pursuant to section 404 of the Clean Water Act. 33 U.S.C. § 1344; Dkt. 37 at 6. Indeed, the NGA independently requires applicants such as ACP to obtain "any permits, special

use authorizations, certifications, opinions, or other approvals as may be required under Federal law." *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 267 (4th Cir. 2018) (internal quotation marks omitted).

Atlantic obtained the necessary USACE permit through Nationwide Permit 12, which imposes several general conditions on permittees. General Condition 10 provides that "[t]he activity must comply with any applicable FEMA-approved state or local floodplain management requirements." 71 Fed. Reg. 56,294. As Nelson County's Floodplain Regulations qualify with FEMA for the purposes of the NFIP, Nelson County argues, it is "FEMA-approved" for the purposes of General Condition 10 of NWP 12. Dkt. 37 at 7–9. As a result, states Nelson County, the CPCN cannot be said to preempt Nelson County's Floodplain Regulations, because the CPCN—or at least NWP 12, another federal authorization—expressly mandates compliance with the Floodplain Regulations.

But Nelson County's argument rests on the faulty premise that the relevant portion of its Floodplain Regulations are "FEMA approved" for the purposes of NWP 12's General Condition 10. 71 Fed. Reg. 56,294. Nelson County argues that, for the purposes of General Ordinance 10, "FEMA approved regulations are those that meet or exceed certain federal minimum standards and qualify a community to participate in the NFIP." *Id*. In support of this reading, Nelson County cites FEMA regulations on the NFIA, which indeed state "[a]ny community may exceed the minimum criteria … by adopting more comprehensive flood plain management regulations" and remain eligible. 44 C.F.R. § 60.1.

This reading is plainly contradicted by USACE guidance on General Condition 10. In its Final Notice by USACE amending Nationwide Permit 12, USACE states that General Condition 10 "requir[es] permittees to comply with applicable state or local floodplain management

requirements that have been approved by [FEMA]." Reissuance of Nationwide Permits, 72 Fed. Reg. 11092–01. Critically, it continues on to state:

> We do not believe it is appropriate to use the Section 404 program to restrict activities in flood plains over and above the requirements of FEMA-approved state and local floodplain management programs, except in specific cases where the district engineer determines that an activity would result in more than minimal adverse effects.

*Id*. USACE later reiterates that it is "deferring to [FEMA's] program *requirements* for floodplain management." *Id*. (emphasis added). While a program surely may meet and then exceed the minimum regulations promulgated by FEMA to qualify for the NFIP, 44 C.F.R. § 60.1, the USACE in promulgating its nationwide permit regulations make clear that General Condition 10 is concerned only with the regulations that are "requirements" for FEMA approval. The regulation's final notice is unequivocal in stating that it was not "appropriate" to use General Condition 10 "to restrict activities in flood plains over and above the requirements of FEMA-approved state and local floodplain management programs." 72 Fed. Reg. 11092-01.

The structure and purpose of USACE's nationwide permitting process further support this conclusion. "The nationwide permit system is designed to streamline the permitting process." *Snoqualmie Valley Preservation Alliance v. U.S. Army Corps of Engineers*, 683 F.3d 1155, 1164 (9th Cir. 2012). This "allow[s] the Corps to designate certain construction projects as eligible for CWA discharge permits with little, if any, delay or paperwork because they fit within these pre-cleared categories of activities." *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 26 (D.D.C. 2013). These purposes would hardly be furthered if any locality could at any time impose any requirement it sees fit and receive the force of federal law as a mandatory condition under NWP 12. Rather, the USACE's scheme clearly envisions that the proper way to regulate "over and above the requirements of FEMA-approved state and local floodplain

management programs" is for USACE's district engineer to "determine[] that an activity would result in more than minimal adverse effects." 72 Fed. Reg. 11092-01. FEMA's floodplain regulation requirements may be a floor for the purposes of the National Flood Insurance Act, but they are a ceiling for the purposes of Atlantic's Nationwide Permit 12 issued by USACE.

Properly defined, it is clear then that Nelson County's Floodplain Regulations—at the very least its insertion of "or transport" into the regulations—are not "FEMA approved" under General Condition 10. Although the Floodplain Regulations were based on FEMA's model provisions, the Nelson County Board of Supervisors altered this language to expand its definition of what constituted a "critical facility" requiring a discretionary variance by its Board of Zoning Appeals. Furthermore, this expanded definition was critical to defining the Atlantic Coast Pipeline as a critical facility for these purposes.

No federal law required Nelson County to pass its Floodplain Regulations as modified on September 18, 2017. Nothing gives these Floodplain Regulations, as modified, the force of federal law now. Rather, as expressed above, because the Floodplain Regulations and their application through the BZA to deny Atlantic's variance request stands as a clear obstacle to the meaning and purposes of the NGA, it is therefore preempted as applied to the Atlantic Coast Pipeline.

## V. Conclusion

For the foregoing reasons, Atlantic's motion for partial judgment on the pleadings will be granted, and Nelson County's motion for summary judgment will be denied. An appropriate order will issue.

Entered this __9th__ day of March, 2020.

Norman K Moon

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE